# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TRACY NORMANDIN; and J. ALLEN SENSABAUGH, Individually and on Behalf of All Others Similarly Situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A.; BANK OF AMERICA N.A.; WELLS FARGO BANK, N.A.; CITIBANK, N.A.; U.S. BANK, N.A.; PNC BANK, N.A.; TRUIST BANK; and JOHN DOE BANKS 1-5;<br><br>*Defendants*. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Date:  October 16, 2025 |

Plaintiffs Tracy Normandin and J. Allen Sensabaugh ("Plaintiffs"), on behalf of themselves and all others similarly situated, file this Complaint against Defendants JPMorgan Chase Bank, N.A.; Bank of America, N.A.; Wells Fargo Bank, N.A.; Citibank, N.A.; U.S. Bank, N.A.; PNC Bank, N.A.; Truist Bank; and John Doe Banks 1-5 (collectively, "Defendants"). Plaintiffs' allegations are made upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, investigation of counsel, and information and belief as to all other matters.

## I.    INTRODUCTION

1.    This case concerns a conspiracy among the largest U.S. banks to fix, raise, and stabilize interest rates on an unimaginably large number of consumer and small-business loans. The banks accomplish this by agreeing with each other on the rate each charges its most creditworthy customers for short-term loans—their "prime rates." Each Defendant's collusively-determined prime rate is then reported by *The Wall Street Journal* (the "Journal") as the "Wall Street Journal U.S. Prime Rate" (the "WSJ Prime Rate" or "WSJ Prime").

2.    WSJ Prime, in turn, serves as a component of the interest rate on *trillions* of dollars in variable-rate loans, which are set at WSJ Prime plus an additional margin. Approximately 70% of all consumer loans issued by domestic banks for amounts under $1 million are indexed to WSJ Prime; approximately 75% of all floating-rate small-business loans are indexed to WSJ Prime; and substantially all variable-rate credit cards in the United States are indexed to WSJ Prime. By coordinating their interest rates for prime customers, Defendant banks not only charge *these* customers supracompetitive rates, but also artificially inflate interest rates for *millions* of loans explicitly tied to the WSJ Prime Rate.

3.      Pertinent to this action, substantially all Home Equity Lines of Credit ("HELOCs") and Consumer Credit Cards are indexed to WSJ Prime.[1]  This Complaint seeks to recover damages for the supracompetitive interest payments made as a result of Defendants' conspiracy to fix, raise, and stabilize their respective prime rates, and consequently, WSJ Prime.

4.      From 1975, when the Journal first published WSJ Prime, to 1992, the Journal determined WSJ Prime by surveying major U.S. banks about their lowest-rate loans and publishing the range of responses, including the lowest and highest reported prime rates. This method of reporting encouraged banks to compete with each other to offer the lowest-rate loans to creditworthy customers.  Prime customers who received a quote higher than the lowest rate published in the Journal knew they could get a better price elsewhere, and a bank that consistently offered loans above the lowest published rate would lose business to more competitively priced institutions.

5.      The Fed Funds Target Rate ("Fed Funds" or "FFTR"),[2] set eight times per year by the U.S. Federal Reserve (the "Fed"), expresses the Fed's target rate for the cost to major U.S.

---

[1]      *See* §V, *infra*.

[2]      The Fed changed its method for reporting the Fed Funds target in 2008, switching from a single number (*see* Federal Funds Target Rate 1982-09-27 to 2008-12-15, FRED (May 4, 2015) fred.stlouisfed.org/series/DFEDTAR (https://perma.cc/ZBC9-EXDA)) to a range (*see* Federal Funds Target Range – Upper Limit from 2008-12-16 to 2025-10-15, FRED (Oct. 15, 2025), fred.stlouisfed.org/series/DFEDTARU (https://perma.cc/RA6A-QMEQ)).    As used in this Complaint, "Fed Funds Target Rate" or "FFTR" or "Fed Funds" all refer to the rate published under that name by the Fed ("DFEDTAR") from September 27, 1982 to December 15, 2008, and the Fed Funds Target Range – Upper Limit ("DFEDTARU") from December 16, 2008 to the present day.  Plaintiffs have concatenated the DFEDTAR and DFEDTARU data series for all available dates from September 27, 1982 to September 1, 2025.  Plaintiffs have also supplemented the official data on Fed Funds rates available from FRED with figures reflecting the target rates in the years 1975-1982, compiled by the Fed in a 2003 memo, and disclosed to the public via FOIA in 2019.  *See* Memorandum from David Lindsey, Board of Governors of the Federal Reserve System, Division of Monetary Affairs, to Normand Bernard, *et al.* (Feb. 20, 2003), www.federalreserve.gov/foia/files/20190829-changes-intended-federal-funds-rate.pdf

banks of borrowing money on the open market. As such, it serves as a close proxy for Defendants' cost of borrowing money that they subsequently lend to their respective customers. The spread between a bank's prime rate and Fed Funds roughly approximates the minimum gross profit a bank earns when lending money.

6.     Before 1992—the year the conspiracy alleged herein began—the spread between WSJ Prime and Fed Funds varied, as one would expect in a competitive market. This variation reflected, among other factors, each bank's unique financial position, the efficiency of its business operations, market conditions, broad consumer credit characteristics, and technological changes.

**TABLE 1 – WSJ Prime Compared to Fed Funds, Pre-Feb. 1992**

|  | 9/27/1982 – 1/31/1992[3] |
|---|---|
| Number of Observations | 2,285 |
| Average spread: Prime – Fed Funds | 193.4 bps |
| Median spread: Prime – Fed Funds | 175 bps |
| Standard Deviation: Prime – Fed Funds | 45.4 bps |
| Number of Days: Prime – Fed Funds = 300 bps | 66 (2.88%) |

---

(https://perma.cc/QA89-888J) (the "2003 Memo"). Translating the dates provided in the 2003 Memo into daily data required some judgment where the 2003 Memo referenced to dates in an imprecise manner (e.g., "late February"). Where ranges for target rates were given, the upper limit is used.

[3]     Because identifying the exact date of pre-1982 Fed Funds target rate changes requires a degree of estimation, only FRED series data recording Fed Funds target rate (i.e., data starting September 27, 1982) is included in Tables in this Complaint (as opposed to Charts).

7.      As Table 1 demonstrates, from late 1982 to early 1992, the median spread between WSJ Prime and Fed Funds was 175 basis points ("bps"), or 1.75%.[4]  In other words, the most creditworthy customers of major U.S. banks typically obtained loans at 1.75% above the rate at which banks were able to borrow money for themselves.  Moreover, the spread between WSJ Prime and Fed Funds varied frequently, with a standard deviation of 45.4 bps.  On approximately two-thirds of days during this period, the spread between WSJ Prime and Fed Funds ranged between 1.3% and 2.2%; on approximately 95% of days, the spread ranged between 0.90% and 2.65%.

8.      Since the conspiracy matured and stabilized in mid-April 1994, the spread between WSJ Prime and Fed Funds has been *exactly* 300 basis points on all but 82 days—out of 7,971 and counting:

**TABLE 2 – WSJ Prime Compared to Fed Funds, Pre- Feb. 1992 vs. Post- April 1994**

|  | <u>9/27/1982 – 1/31/1992</u> | <u>04/19/1994 – 9/22/2025</u> |
|---|---|---|
| Number of Observations | 2,285 | 7,971 |
| Average spread: Prime – Fed Funds | 193.4 bps | 300.11 bps |
| Median spread: Prime – Fed Funds | 175 bps | 300 bps |
| Standard Deviation: Prime – Fed Funds | 45.4 bps | 3.83 bps |
| Number of Days: Prime – Fed Funds = 300 bps | 66 (2.88%) | 7,889 (98.97%) |

9.      As Table 2 demonstrates, since mid-1994, banks' best customers have been unable to obtain loans at rates below 3.00% above Fed Funds—even though just a few years earlier, prime

---

[4]      100 bps = 100 basis points = 1%.

rates between 1% and 2% above Fed Funds were the norm. This has held true *nearly every single day* for more than *30 years*, despite three recessions, the securitization boom, massive bank consolidations, complete restructuring of banking regulations, and the digital transformation of the industry, and now, artificial intelligence.

10. What fundamentally changed to eliminate all competitive variation in prime rate spreads? The answer lies in two critical developments that created the conditions for—and then facilitated—the banks' collusive agreement.

11. First, in February 1992, the Journal changed the way it reported WSJ Prime. Instead of publishing the *range* of prime rates available from major banks, the Journal began publishing *one* number: "the rate posted by at least 75% [now 70%] of the nation's 30 [now 10] largest commercial banks."

12. The Journal's new methodology pushed banks—horizontal competitors for consumer loans—toward a single "consensus" rate. Whether the Journal understood it or not, unlike the pre-1992 "range" method, the new "consensus" method *discouraged* competition. Because the Journal would no longer publish lower-than-consensus rates, individual banks lost the ability to exert public competitive pressure on other large banks.

13. The change also made it easier for the banks to coordinate prices and to raise them marketwide. Because the Journal identified WSJ Prime as the market consensus price, and minimized the advantage of undercutting that price, banks could confidently coalesce around a consensus price. The methodology used to report WSJ Prime thus encouraged banks to coordinate establishment of an artificial price floor on their respective prime rates.

14. And the banks *did* coordinate, almost immediately. Within weeks of the 1992 methodology change, WSJ Prime became substantially less variable, and spreads over Fed Funds

began to increase.  In February 1992, when the Journal first instituted consensus reporting, Fed Funds stood at 4.00% and WSJ Prime at 6.50%—a 250 basis point spread.  On April 9, 1992, the Fed dropped its target rate to 3.75%.  WSJ Prime, however, remained at 6.50%—increasing the spread by 25 basis points.  Because the banks knew the prime rate would change only if at least 25% of them lowered it, they simply refrained from doing so.  WSJ Prime remained at 6.50% until July 2, when Fed Funds dropped 50 basis points to 3.25%, and the next day WSJ Prime moved down 50 basis points in parallel to 6.00%—maintaining its elevated 275 basis point spread.  When the Fed dropped another quarter point in September, WSJ Prime did not follow—pushing the spread to 300 basis points.

15.    The conspiracy's second phase began in February 1994, when the Fed first began publishing explicit targets for Fed Funds.  By then, the banks had learned to maintain their rates in lockstep.  Presented with official target rates, they coordinated to peg their prime rates to these publicly available, high-profile benchmarks.  After two months during which the banks coordinated the level at which they would set prime rates, they settled on the formula that persists today: Fed Funds plus 300 basis points.

16.    The effect of the conspiracy is apparent from the chart below, which tracks the difference between WSJ Prime and Fed Funds + 300 bps from 1975 to 2025:[5]

---

[5]    Unlike the Tables, Fed Funds as represented in the Charts in this Complaint include non-FRED pre-1982 Fed Funds Target data. *See supra* note 2.

**CHART 1 – WSJ Prime Compared to Fed Funds + 300 bps, Jan. 1975 - Present**



17.    As Chart 1 shows, before 1992, prime rates (red line) were highly variable and almost always *below* Fed Funds + 300 bps (blue line).  Shortly after the 1992 methodology change (marked by a vertical dotted line), the lines merge, and complete overlap persists thereafter.

**CHART 2 – WSJ Prime Compared to Fed Funds + 300 bps, Jan. 1975 – Feb. 1992 (pre-conspiracy)**



18.    Chart 2 enhances the pre-1992 period, illustrating what Table 1 quantifies: WSJ Prime (red line) generally tracked Fed Funds + 300 bps (blue line), but considerable variation existed in the spread (e.g., lines nearly touching in late 1984; gap substantially wider in 1986-87). WSJ Prime remained nearly always below Fed Funds + 300 bps (i.e., the red line stayed below the blue line).

**CHART 3 – WSJ Prime Compared to Fed Funds + 300 bps, Feb. 1992 - present (conspiracy)**



19.     Chart 3 enhances the post-1992 period, illustrating what Table 2 quantifies: after the Journal's methodology change, WSJ Prime (red line) almost immediately converged with Fed Funds + 300 bps (blue line) and has remained there for nearly 30 years (i.e., the blue line covers the red line).

20.     Since April 19, 1994, the WSJ Prime Rate has been *exactly* 300 basis points above Fed Funds *every day* with only 82 exceptions—all attributable to timing lags between: i) when the Fed announces Fed Funds rate changes (often in the afternoon after the Journal has gone to print that morning), and Defendants adjust their reported prime rates (typically on the same day as the Fed Funds change); and ii) when the Journal updates the WSJ Prime rate as printed in the Journal.

21.     From June 30, 1999, to September 21, 2004, the Fed adjusted Fed Funds 22 times. On 21 of those occasions, WSJ Prime moved in parallel two days later (i.e., if Fed Funds moved down 0.25% on Monday, then WSJ Prime moved down 0.25% on Wednesday); on the remaining

occasion, it moved three days later.  WSJ Prime also moved in exact parallel two days after Fed Funds on two occasions in 2008.  On 33 other occasions over the past 30 years, WSJ Prime moved in exact parallel within one day of Fed Funds moving.  Only two of these one-day lags have occurred since the end of 2016—WSJ Prime moved in parallel within one day of the Fed Funds rate adjustments in September 2024 and September 2025.[6]

22.     The stark contrast between the periods before and after the Journal's 1992 methodology change reveals the conspiracy's impact.  As Chart 2 shows, before the 1992 methodology change, prime rates varied according to day-to-day conditions at lending banks, and beneath that daily variability lay longer-term trends reflecting industry-wide changes in the banking business.  As Chart 3 demonstrates, after 1992, when the banks began coordinating their individual prime rates, the variability in the prime rate market—both day-to-day and long-term—disappeared.  Since then, Defendants' prime rates and consequently, WSJ Prime, have been fixed, regardless of the market conditions that caused them to vary, day-to-day or long-term, just months before.  What little variability exists relates solely to the timing of the banks' response to Federal Reserve decisions to change Fed Funds, not to genuine competition.  Every factor that previously drove prime rate competition, leading to marketwide prime rates consistently below Fed Funds

---

[6]     Twenty-one two-day lags plus one three-day lag during the 1999-2004 time period equals 45 days of mismatched rates.  Two additional two-day lags in 2008 brings the total to 49 days.  Adding the remaining 33 one-day lags brings the total to 82 days with mismatched rates.  However, the first day of the majority of these lags are likely attributable to the timing of rate changes.  In particular, the Journal prints in the morning, and the Fed often adjusts Fed Funds in the afternoon (with Defendants adjusting their prime rates in parallel soon after on that same day), meaning the Journal's WSJ Prime morning print on the days Fed Funds changed was likely a match (i.e., was equal to Fed Funds plus 3%) when printed, before the rates changed later that afternoon.  Thus, while Plaintiffs counted such days in reaching the overall figure of 82, that number is likely a conservative count.

plus 300 bps, has been eliminated by Defendants' horizontal conspiracy to fix, raise, and stabilize prices.

23.     This level of uniformity cannot be the result of independent decision-making. Before 1992, banks faced identical macroeconomic conditions and regulatory frameworks, yet 300 bps prime spreads over Fed Funds were rare.  More importantly, the data shows that each bank independently set different prime rates reflecting their individual business circumstances—their balance sheets, operational efficiency, risk appetites, and competitive strategies.  If independent rational decision-making produced the pre-1992 variation in prime rates and spreads, it is not possible that the same independent decision-making produced absolute uniformity post-1992.  The only possible explanation for over 30 years of identical prime rates is Defendants' coordination. WSJ Prime's 300 basis point spread over Fed Funds is not a natural equilibrium that rational competitors would independently (and simultaneously) discover and then maintain with near-perfect consistency for three decades through recessions, regulatory upheavals, and technological transformation.  Instead, it is exactly what it appears to be: a coordinated price floor.

24.     From at least December 1, 2008, to the present, WSJ Prime has been the most widely used index for consumer and small commercial floating-rate loans in the United States. Throughout that entire period, WSJ Prime—and therefore all loans whose interest rates are indexed to WSJ Prime,[7] has been fixed by Defendants.

25.     These floating-rate loans, widely offered by most banks and each of the Defendants, include contractual language expressly indexing the loans to WSJ Prime.  For example, Defendant

---

[7]     Throughout this Complaint, loans indexed to WSJ Prime are referred to as WSJ-Prime Indexed Loans, HELOCs secured by the debtor's principal residence and indexed to WSJ Prime are referred to as WSJ-Prime Indexed HELOCs, and variable-rate personal credit cards indexed to WSJ Prime are referred to as WSJ Prime-Indexed Consumer Credit Cards.

U.S. Bank sets the interest rate a consumer must pay on a HELOC by "add[ing] a margin to the value of the index," where the index is defined as "the Wall Street Journal U.S. Prime Rate." In the case of a WSJ Prime-Indexed Consumer Credit Card, Bank Defendant JPM sets the interest rate a consumer must pay "by adding a margin to the highest U.S. Prime Rate published in the Money Rates section of The Wall Street Journal" on a given day.

26.     Because WSJ Prime is a component of the price Defendants and others charge for these loans, and because WSJ Prime is set by reference to Defendants' reported prime rates, Defendants' collusive agreement to fix, raise, and stabilize their prime rates inflates the interest rate on trillions of dollars of floating rate debt by the exact amount of the supracompetitive overcharge.

27.     In this case, Plaintiffs seek to recover the supracompetitive interest payments they made on two types of WSJ Prime-Indexed Loans: HELOCs and Consumer Credit Cards. Most HELOCs and substantially all Consumer Credit Cards issued in the United States are pegged to WSJ Prime.

28.     Plaintiffs bring this action on their own behalf and on behalf of those similarly situated to recover the substantial damages they have suffered as a result of this anticompetitive agreement.

## II.    PARTIES

### A.    Plaintiffs

29.     Plaintiff Tracy Normandin is a resident of Pueblo West, Colorado. During the Class Period, Plaintiff Normandin has transacted in financial instruments indexed to WSJ Prime, including a HELOC obtained from Defendant Bank of America in or around June 2023 that he continues to hold. The variable interest rate on Plaintiff Normandin's Bank of America HELOC is "based on the value of an index (referred to in this disclosure as the 'Index'). The Index is the

Prime Rate as published by *The Wall Street Journal*. When a range of rates has been published, the higher of the rates will be used. Information about the Index is available or published at least weekly in *The Wall Street Journal*'s Money Rates Table."

30.    Plaintiff J. Allen Sensabaugh is a resident of Menifee, California. During the Class Period, Plaintiff Sensabaugh has transacted in financial instruments indexed to WSJ Prime, including a WSJ Prime-Indexed Consumer Credit Card issued by Defendant Citibank that he continues to hold. The Annual Percentage Rate ("APR") on the consumer credit card is indexed to "the Prime Rate published in *The Wall Street Journal* two business days before the Statement Closing Date."

31.    Plaintiffs have suffered, and continue to suffer, damages resulting from Defendants' violations of law in the form of higher interest costs on their WSJ Prime-Indexed Instruments.

**B.    Defendants**[8]

32.    Defendant JPMorgan Chase Bank, N.A. ("JPM") is a nationally chartered bank that maintains its principal place of business in Columbus, Ohio. It is a wholly owned principal subsidiary of JPMorgan Chase & Co., which is incorporated in Delaware and maintains its headquarters in New York, New York. JPM is a national banking association and has been the largest bank in the United States in terms of total assets over the past five years.

33.    JPM has earned profits from interest charged on consumer and small business loans indexed to WSJ Prime, including WSJ Prime-Indexed HELOCs and WSJ Prime-Indexed Consumer Credit Cards, during the Class Period.

---

[8]    The Journal does not publish the identities of the banks it polls to calculate WSJ Prime. However, based on the Journal's publicly stated methodology, each named Defendant has participated in the WSJ Prime rate-setting process at some point during the Class Period.

34.    Defendant Bank of America, N.A. ("BOA") is a nationally chartered bank that maintains its principal place of business in Charlotte, North Carolina, with operations in all 50 states.  BOA is a wholly owned subsidiary of Bank of America Corporation, which is incorporated in Delaware.  BOA has been the second largest bank in the United States in terms of total assets over the past five years.

35.    BOA has earned profits from interest charged on consumer and small business loans indexed to WSJ Prime, including WSJ Prime-Indexed HELOCs and WSJ Prime-Indexed Consumer Credit Cards, during the Class Period.

36.    Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a nationally chartered bank that maintains its principal place of business in San Francisco, California.  Wells Fargo is a wholly owned subsidiary of Wells Fargo & Company, which is incorporated in Delaware.  Wells Fargo is currently the third largest bank in the United States in terms of total assets.  Wells Fargo has been either the third or fourth largest bank in the United States in terms of total assets over the past five years.

37.    Wells Fargo has earned profits from interest charged on consumer and small business loans indexed to WSJ Prime, including WSJ Prime-Indexed HELOCs and WSJ Prime-Indexed Consumer Credit Cards, during the Class Period.

38.    Defendant Citibank, N.A. ("Citi") is a nationally chartered bank that maintains its principal place of business in New York, New York.  Citi is a wholly owned subsidiary of Citigroup Inc., which is incorporated in Delaware.  Citi is currently the fourth largest bank in the United States in terms of total assets.  Citi has been either the third or fourth largest bank in the United States in terms of total assets over the past five years.

39. Citi has earned profits from interest charged on consumer and small business loans indexed to WSJ Prime, including WSJ Prime-Indexed HELOCs and WSJ Prime-Indexed Consumer Credit Cards, during the Class Period.

40. Defendant U.S. Bank, N.A. ("U.S. Bank") is a nationally chartered bank that maintains its principal place of business in Minneapolis, Minnesota. U.S. Bank is a wholly owned subsidiary of U.S. Bancorp, N.A., which is incorporated in Delaware. U.S. Bank has operations in 27 states, and has been the fifth largest bank in the United States in terms of total assets over the past five years.

41. U.S. Bank has earned profits from interest charged on consumer and small business loans indexed to WSJ Prime, including WSJ Prime-Indexed HELOCs and WSJ Prime-Indexed Consumer Credit Cards, during the Class Period.

42. Defendant PNC Bank, N.A. ("PNC") is a nationally chartered bank that maintains its principal place of business in Pittsburgh, Pennsylvania. PNC is a wholly owned subsidiary of PNC Financial Services Group, which is incorporated in Pennsylvania. PNC is currently the sixth largest bank in the United States in terms of total assets. PNC has been either the sixth or seventh largest bank in the United States in terms of total assets over the past five years.

43. PNC has earned profits from interest charged on consumer and small business loans indexed to WSJ Prime, including WSJ Prime-Indexed HELOCs and WSJ Prime-Indexed Consumer Credit Cards, during the Class Period.

44. Defendant Truist Bank ("Truist") is a non-member bank that maintains its principal place of business in Charlotte, North Carolina. Truist is a wholly owned subsidiary of Truist Financial Corporation, which is incorporated in North Carolina. Truist was formed on or around December 6, 2019, via a combination of BB&T Bank and SunTrust Bank. Truist is currently the

eighth largest bank in the United States in terms of total assets. Truist has been either the sixth, seventh, or eighth largest bank in the United States in terms of total assets over the past five years.

45.     Truist has earned profits from interest charged on consumer and small business loans indexed to WSJ Prime, including WSJ Prime-Indexed HELOCs and WSJ Prime-Indexed Consumer Credit Cards, during the Class Period.

### 1.    John Doe Bank Defendants

46.     Defendants John Doe Banks 1-5 represent currently unknown banks that participated in the WSJ Prime index rate setting process during the Class Period.

### 2.    References to Defendants

47.     As used herein, "Defendants" refers to and includes each named Defendant's predecessors, successors, parents, wholly owned or controlled subsidiaries or affiliates, employees, officers, and directors.

48.     Whenever this Complaint references any act, deed, or transaction of any corporation or partnership, that allegation means the corporation or partnership engaged in the act, deed, or transaction through its officers, directors, agents, employees, representatives, parent, predecessors, or successors-in-interest while they were engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

### C.    Agents, Affiliates, and Co-conspirators

49.     Dow Jones & Company, Inc. ("Dow Jones") is a publisher with its principal place of business in New York, New York. Dow Jones is incorporated in Delaware and is a wholly owned subsidiary of News Corp. Dow Jones publishes the Journal under the name *The Wall Street Journal*. Through its publication of WSJ Prime, Dow Jones materially contributed to Defendants' ability to fix and stabilize their prime rates.

50.    Various persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts or made statements in furtherance of the conspiracy. Each named Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein. Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not named as Defendants in this Complaint.

## III.    JURISDICTION, VENUE, AND COMMERCE

51.    This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1367.

52.    Venue is proper in this District under 15 U.S.C. §22 and 28 U.S.C. §1391(b), (c), and (d). During the Class Period, Defendants resided, transacted business, were found, or maintained agents in the United States, including in this District.

53.    A substantial portion of the conduct alleged herein affected interstate trade and commerce, including in this District.

54.    Defendants' conduct occurred within the flow of interstate commerce, was intended to affect interstate commerce, and did substantially affect the interstate commerce of the United States.

55.    Each Defendant maintains a substantial physical presence in Connecticut and has transacted business in this District during the Class Period. Specifically: Defendant JPM operates 61 branch and ATM locations in Connecticut; Defendant BOA operates 70 branch and ATM locations in Connecticut; Defendant Wells Fargo operates more than 25 branch and ATM locations in Connecticut; Defendant Citi operates 60 ATM locations in Connecticut; Defendant U.S. Bank operates over 30 ATM locations in Connecticut; Defendant PNC operates 150 partner ATM locations in Connecticut; and Defendant Truist operates over 100 partner ATM locations in Connecticut.

## IV.    FACTUAL ALLEGATIONS

### A.    Prime Rates

56.    According to Defendant Citi, each bank's prime rate is "the rate at which banks lend funds to their most reliable and creditworthy customers."[9]  Loans at a bank's prime rate[10] are typically reserved for short-term loans to well-funded corporate borrowers with a low risk of default.

57.    The Journal began publishing prime rates in January 1975.  Today, the published WSJ Prime Rate is "the base rate on corporate loans posted by at least 70% of the 10 largest U.S. banks."[11]  Between 1992 and 2008, WSJ Prime was "the rate posted by at least 75% of the nation's 30 largest commercial banks."  Before the 1992 methodology change described below, the Journal reported the "Prime lending rate at large New York banks" as a range.

58.    Throughout the Class Period and extending back to at least 1992, WSJ Prime has been used by Defendants and others as a component of the interest rate on a wide variety of

---

[9]    *What Is the Prime Rate?*, CITI (Sept. 24, 2025), https://www.citi.com/credit-cards/money-management/what-is-a-prime-rate; *accord* James Chen, *Prime Rate: Definition and How It Works*, INVESTOPEDIA (Oct. 21, 2024), www.investopedia.com/terms/p/primerate.asp (https://perma.cc/WTS3-XA2N) ("The prime interest rate is the percentage that U.S. commercial banks charge their most creditworthy customers for loans."); *What Is a Prime Rate?*, CHASE, www.chase.com/personal/credit-cards/education/interest-apr/what-is-a-prime-rate  (last  visited Oct. 14, 2025) (https://perma.cc/D2X9-736N) ("The prime rate is a type of interest rate that is set by banks and lenders as a baseline for what APR they want to charge."); *What is the prime interest rate and how does it work?*, CAPITAL ONE (Mar. 18, 2024), https://www.capitalone.com/learn-grow/money-management/prime-interest-rate/ ("The prime rate is a baseline banks use for setting APRs.").

[10]    Some banks also refer to their prime rate as their "base" rate.

[11]    *Money Rates*, WSJ (last visited Oct. 15, 2025), https://www.wsj.com/market-data/bonds/moneyrates.

variable-rate loans[12] to consumer and business customers, including most HELOCs and substantially all U.S. variable-rate credit cards—the financial instruments relevant to this lawsuit. These WSJ Prime-Indexed Loans add a fixed percentage to the WSJ Prime Rate to determine interest rates applicable to the loan.  All WSJ Prime-Indexed Loans are variable-rate.

59.     Defendants publicly insist that "[e]ach bank determines its own prime rate" and that "interest rates can vary by institution."[13]  Defendant JPM claims banks set their own prime rates "based on a number of factors" according to "market conditions."[14]  Defendant Bank of America asserts, "[t]he prime rate is set by Bank of America based on various factors, including the bank's costs and desired return, general economic conditions and other factors."[15]

60.     These are both false statements and damning admissions.  These statements accurately reflect how prime rates *should* be set in a competitive market.  They demonstrate that Defendants do in fact know that their prime rates *should* be set independently, with each bank giving due consideration to financial conditions both at that individual bank, and marketwide.

61.     But in reality, the prime rate each Defendant posts publicly which the Journal reports as WSJ Prime is fixed at Fed Funds plus 3.00%.  Defendants' individual prime rates do not reflect competitive "market conditions" and are not set by reference to "a number of factors" like inflation or the current demand for loans.  Rather, despite publicly stating otherwise, Defendants' reported prime rates are the product of an agreement to fix rates at exactly 3.00% above Fed Funds.

---

[12]     A variable-rate or floating-rate loan is a debt instrument where the interest rate, expressed as an annual percentage rate ("APR"), can change over time, as opposed to fixed-rate loans where the APR is fixed at the time of the debt instrument transaction.

[13]     *What Is the Prime Rate?*, CITI, *supra* note 9.

[14]     *What Is a Prime Rate?*, CHASE, *supra* note 9.

[15]     Newsroom, *Prime Rate Information*, BANK OF AM., newsroom.bankofamerica.com/content/newsroom/home/prime-rate-information.html (last visited Oct. 14, 2025) (https://perma.cc/A2BA-MYB7).

The WSJ Prime Rate, reflecting the consensus of *at least* 70% of the country's largest banks, has been pegged to exactly Fed Funds plus 3.00% for more than 30 years.

62.    The individual prime rates banks set and reported to the Journal almost never varied from the fixed rate of Fed Funds plus 3.00%. Dating back to at least 2016, all seven Defendants have moved their prime rates in parallel, typically on the same day the Fed moves Fed Funds. *See* ¶106 and Figure 2, *infra*. Indeed, BOA and JPM, who unlike the other Defendants, publish their historical prime rates online, have changed their prime rates on exactly the same days by exactly the same amounts since September 22, 2004.

63.    Indeed, the formula for Defendant Banks to set their prime rates is well understood in the banking world as "Fed plus twenty," where the "twenty" refers not to basis points but to minutes. In other words, it is understood that 20 minutes after the Fed changes Fed Funds, one or more Defendants will change their prime rate in lockstep with the Fed move, and the rest will follow. This pattern has held true during the past four years of Fed Funds rate activity. *See* ¶104 *et seq*, *infra*.

**B.    Before the Conspiracy, Banks Set Prime Rates Competitively**

64.    Before the advent of the conspiracy alleged here, banks, including Defendants and their predecessors, set their prime rates individually and competitively. Prime customers shopped for the best available loan rates, and banks priced their rates as low as they reasonably could to capture market share. From 1975 to 1992, the Journal printed either the consensus prime rate (if a marketwide consensus existed) or the range of prime rates (often called a "split rate") available at the largest banks. Especially early in this period, split rates were common. From 1975-1979, the Journal published a split prime rate on approximately 36% of days. Stretches of 20-30 consecutive days during which the Journal would publish split (and fluctuating) prime rates were common in the late 1970s.

65.    The Journal's published range of prime rates facilitated customers' ability to comparison shop for prime loans and further disciplined banks' prices.  Indeed, thanks to the Journal's reporting, prime customers knew when their banks' offered rates exceeded the lowest in the market, without having to conduct their own arduous polls of major lenders.

66.    In this pre-conspiracy competitive market, banks gained a competitive advantage if they could offer lower rates than their competitors.  Individual banks were incentivized to find opportunities to undercut their competitors, taking advantage of considerations including available deposits and reserves, their portfolio of existing loans, internal forecasts of the future direction of markets, their own internal business efficiency, and the credit characteristics of their existing customer base.

67.    Since all banks' rates reflected similar macroeconomic conditions that are also reflected in Fed Funds, an aggregated WSJ Prime should move generally in the same direction as Fed Funds.  But as would be expected in a competitive market where individual banks' prime rates reflected numerous individual variables, before the conspiracy, substantial variance existed in individual banks' prime rates on any given day, and banks changed their rates in real time as market conditions changed.

68.    The data bears this out.  From 1975, when the Journal first began publishing its highest and lowest surveyed prime rates, to 1992, when the Journal changed its methodology, the Journal published a rate range approximately 20% of the time.  The average difference between the highest and lowest prime rates was 37 bps, and the range reached over 100 bps on several occasions.

69.    The following chart from the first half of 1980, a particularly volatile economic period, demonstrates how the spread between the highest and lowest prime rates, as reported in the Journal, varied depending on market conditions:

**CHART 4 – WSJ Prime Gap Between High and Low on Days Where a Range was Printed, January to June 1980**



70.    Chart 4 shows that, at various points in 1980, a customer could reasonably expect between 50 and 100 basis points in variation between banks with the lowest and highest prime rates.  It also demonstrates that individual bank rates varied daily.

**CHART 2** (*supra* ¶17) – **WSJ Prime Compared to Fed Funds + 300 bps, Jan. 1975 – Feb. 1992 (pre-conspiracy)**



71.    Chart 2, reprinted for convenience, demonstrates how before the Journal's 1992 methodology change and the formation of the conspiracy, prime rates offered by Defendants varied significantly and reflected a variety of factors *other than* the Fed's monetary policy.  Banks' prime rates and their spreads over Fed Funds varied from day to day, reflecting banks' real-time competitive judgments about the rates they could offer given their individual balance sheets, expectations of future market conditions, credit expectations, and business efficiencies.  Rates were also typically low: as noted above, the arithmetic mean spread from 9/27/1982 – 1/31/1992 was 193 bps, with a median spread between prime rates and FFTR of 175 bps.

72.    Moreover, as Chart 2 demonstrates, not only did prime rates vary day to day, but broad market conditions led to longer-term changes in *average* spreads between prime rates and FFTR.  These changes likely reflect industrywide changes in business practices, market outlook,

23

consumer credit, regulation, and risk management.  Several examples from the data illustrate the expected day-to-day and broader market volatility of a competitive market:

73.     From early 1975 to mid 1975, prime spreads over FFTR regularly stood around 200 bps.  Then, in May and June of 1975, spreads between prime and FFTR rapidly closed to under 100 bps and remained around 100 bps until rapidly expanding to 300 bps in early September 1975.

74.     In late 1976, average spreads dropped significantly, and competitive pressure from, among other matters, the highest inflation levels seen in generations kept spreads low until April 1980.  During this period, spreads stood around 100 bps—nearly 50% below prior-period spreads.

75.     The debate and passage of the Monetary Control Act of 1980 (signed March 31, 1980), which required all depository institutions to meet the Fed's reserve requirements, exemplify regulatory uncertainty causing significant volatility in prime rates.  During February, March, November, and December of 1980, prime spreads to Fed Funds were regularly *negative* (*i.e.*, the prevailing prime rate fell below Fed Funds).  Between February and April 1980, prime spreads to Fed Funds ranged from -425 to +850 bps.

76.     After the recession of 1981-82, volatility receded, and the market reached a new, stable (but not fixed) spread of around 175 bps, lasting from March 1983 to October 1990.  In late 1990, average spreads again rose, to around 275 bps.

77.     The variance in spreads for the pre-1992 period shown in Charts 2 and 4 is to be expected in a competitive market.  The lowest return banks are willing to accept in the marketplace *should* vary, both in the aggregate *over time* due to market conditions that affect all banks (Chart 2), and from bank to bank *at any given time* based on each particular bank's balance sheet, cost structure, market position, market and business expectations, and reputation with consumers

(Chart 4).  As described immediately above, prime rates often moved daily and were subject to the day-to-day unpredictability inherent in any competitive market.

78.    In early 1992, however, the variation in spreads that characterizes a healthy, competitive market began to disappear.

**C.    After the Journal Changed Its Method for Calculating WSJ Prime, Banks Colluded with Each Other to Fix Rates**

79.    From 1975 to early February 1992, the Journal published a range of prime rates approximately one day out of every five, including the lowest and highest daily prime rates available from major U.S. banks.  As discussed above, publishing rates in this manner encouraged competition among the banks.

**1.    The Journal Changes Its Methodology**

80.    On February 4, 1992, the Journal announced a change to the way it would calculate WSJ Prime.  Rather than publishing a range of values, the Journal would select "the" rate available from at least 75% of the nation's 30 largest commercial banks.  It explained this change by reference to banks' practice of pegging variable-rate loans to the published prime rate, and the difficulties that resulted from the Journal publishing a split rate as a result:

**FIGURE 1 – WSJ Prime Methodology Change, February 4, 1992**

## Listing of Prime Rate Has New Rule for Computation

The prime rate figure reported daily in the "Money Rates" column on this page will be the rate posted by at least 75% of the nation's 30 largest commercial banks, starting today. Previously, a split rate, showing the range, was reported whenever one or more of the largest banks differed from the rest.

A number of banks and other financial institutions price some of their business and consumer loans according to the prime rate reported in this newspaper, although they do so without the Journal's participation or endorsement. Some financial institutions have the option of choosing the higher rate for pricing these loans when a range is reported. That would at times cause the loans to be priced at a higher rate than was prevailing at the vast majority of large banks.

Under the new basis, a split prime rate will appear only if the same rate is not posted by at least 75% of the largest banks.

81.    This announcement clearly and publicly laid out the Journal's intention to assist major banks in coordinating and stabilizing their respective prime rates around a single consensus price.  The Journal's explicit goal was to create a single-number WSJ Prime, that would require coordinated prime rate price movements among the nation's 30 largest banks to change from one publication to the next.  The aftermath of the Journal's methodology change saw Defendant Banks reduce, and then eliminate, any variance between their individual prime rates.

82.    The new methodology made it difficult for individual banks to gain market share by undercutting competitors' prices, in two ways.  *First*, by publishing a single number instead of a range, the Journal masked any variance in the market, making it harder for prime customers to know when they could find a better deal in the open market than was available from their ordinary banking relationships.

83.    Tellingly, though the methodology change ostensibly allowed for a split WSJ Prime rate to be reported if the individual banks did not all agree, the Journal has not printed a split WSJ Prime rate since Christmas Eve 1991—two days before the formal dissolution of the U.S.S.R. and one month before the methodology change.

84.    *Second*, lower rates were no longer published anonymously by the Journal; banks wishing to offer lower rates would have to advertise aggressively to reach potential customers. This made it easy for the close-knit and interdependent community of banks to identify and exact retribution on banks that defected from collusively set consensus rates.

85.    Nor could banks seek to capitalize on individual business efficiencies by forcing competitors to cut prices or lose business.  In the split rate era of WSJ Prime (1/20/1975 – 2/4/1992), banks charging prime rates above the lower end of the range risked losing customers. After the Journal changed its methodology, no individual bank could lower the perceived market

27

price (WSJ Prime) or exert competitive pressure on other banks to match that lower rate. Cutting prices now reduced revenue for efficient banks *without* imposing an equivalent penalty on less efficient banks.

### 2.     Banks Take the Opportunity to Fix Prices

86.     Banks certainly understood the incentives to collude under the new reporting regime and its susceptibility to supracompetitive price manipulation. Almost immediately after the Journal changed its methodology, Defendants colluded with each other to fix, stabilize, and raise their prime rates above competitive levels.

87.     From February 4, 1992, when the Journal published its new methodology, to February 3, 1994, when the Fed began publishing its target rates, the spread between WSJ Prime and Fed Funds targets grew from 2.5% to 3%, changing only twice and never declining. After the Fed began publishing Fed Funds Target rates on February 4, 1994, spreads briefly fluctuated as the banks adjusted to a new coordination procedure. However, in the 7,971 days between April 19, 1994 and September 22, 2025, WSJ Prime has varied from Fed Funds Target plus 300 bps only *82* days— 1% of the time. Of the 82 days with disparities, *every single time* WSJ Prime moved to match Fed Funds + 300 bps within three days of the date the Fed Funds rate moved. *See* ¶¶21-22, *supra*.

88.     As a reminder, this is what variability between: i) WSJ Prime, and ii) Fed Funds + 300 bps, looked like *before* the conspiracy began:

**CHART 2** (*supra* ¶17) **– WSJ Prime Compared to Fed Funds + 300 bps, Jan. 1975 – Feb. 1992 (pre-conspiracy)**



89.    This is what variability between: i) WSJ Prime; and ii) Fed Funds + 300 bps, looked like *after* the conspiracy began, and what it still looks like today:

**CHART 3** (*supra* ¶18) **– WSJ Prime Compared to Fed Funds + 300 bps, Feb. 1992 - present (conspiracy)**



90.    *All* the day-to-day variability that came from Defendant Banks' efforts to competitively price their prime rates has disappeared.  The *only* factor that has moved the prime rate in 30 years is changes to the FFTR.  *None* of the factors on which Defendants previously used to adjust their prime rates day-to-day—individual balance sheets, cost structures, market judgments, reputational concerns, or customer characteristics—has any bearing on how Defendants set and report their prime rates today.

91.    The lack of short-term variability becomes stark when WSJ Prime is plotted alongside two other highly visible benchmark rates, 3-Month LIBOR and the yields on 2-year U.S. Treasuries ("UST 2Y"), both of which generally move *with* Fed Funds but are not *pegged to* Fed Funds like Defendants' prime rates (and consequently, WSJ Prime):

**CHART 5 – WSJ Prime vs Fed Funds vs Three-Month LIBOR vs Two Year U.S. Treasuries, 2016 - present**



92.     As Chart 5 shows, 3-Month LIBOR and UST 2Y fluctuate on a daily, weekly, and monthly basis—with the result that they have irregular and jagged plot lines—while Fed Funds and WSJ Prime do not.

93.     Perhaps even more tellingly, *long-term* variability between Fed Funds and Defendants' prime rates (and therefore, WSJ Prime) reflecting industrywide conditions other than monetary policy has also disappeared since the conspiracy stabilized in April 1994.

94.     Conditions in the banking industry have changed significantly over the last 30 years, including:

- tremendous increases in available computing power and cost-efficiency;

- the emergence of the internet;

- the Gramm-Leach-Bliley Act of 1999, blurring lines between commercial and investment banking;

31

- dramatic consolidation in the banking industry, with the 10 largest banks holding 15% of deposits in 1993 versus nearly half of deposits in 2024;

- the bursting of the dot-com bubble in 2001;

- the terrorist attacks of September 11, 2001;

- the rise of securitization in packaging and spreading the risk of consumer and small business loans;

- the subprime mortgage crisis, collapse of major investment banks, and Great Recession of 2007-2009;

- the Dodd-Frank regulatory reforms;

- COVID-19 and its associated recession in 2020; and

- the emergence of cryptocurrencies and artificial intelligence.

95.    These changes individually and collectively *should* have affected Defendants' individual prime rates and the spread between those rates and the FFTR.  As just a few obvious examples, bank consolidation during the period should have increased efficiency and lowered prime rate spreads.  The wholesale digitization of banking during the period should have lowered overhead costs and lowered prime rate spreads.  The securitization boom during the period should have spread risk and lowered prime rate spreads.  And the Dodd-Frank regulatory reforms materially changed capital and lending requirements, making a static before-and-after prime rate spread wholly implausible.

96.    Throughout all of these changes, despite the variability of prevailing rates before 1992 and the continued variability of other floating rates that move with FFTR after 1992 (e.g., LIBOR), Defendant Banks have maintained their lowest lending rates for their best customers at *exactly* FFTR plus 300 basis points.  This does not represent a competitive price.  Instead, it is an obviously collusive price floor.

D.    **Prime Rates Reflect a Collusive Agreement Among Horizontal Competitors that Violates the Antitrust Laws**

97.    Prime rates have not remained at FFTR plus 300 bps for more than 30 years by accident or by the independent unilateral decision-making of each individual Defendant.  Rather, prices have remained fixed because of an agreement among these horizontal competitors—a "common design and understanding, or a meeting of minds"—to *keep* them that way.[16]

98.    On information and belief, this agreement is and always has been explicit, a topic of conversation among employees with rate-setting authority at each Defendant bank.  On information and belief, those inter-bank conversations continue to this day, although the agreement has been in place so long that explicit affirmations are likely rare, reserved for casual conversations between employees who have not paid enough attention to their antitrust training.  But on information and belief, the agreement remains robust and is passed down through the years within each bank as explicit instructions about how to set prime rates.

99.    At minimum, the manner in which Defendants have set their prime rates represents a common design and understanding among Defendants that each will price its prime rate at exactly 300 bps above FFTR, regardless of *any* business considerations that might otherwise lead Defendants to offer different prime rates in a competitive market.

100.    Defendants also communicate their adherence to the conspiracy by announcing prime rate changes in press releases, via social media, and on public websites, with the actual knowledge or understanding that the Journal collects and uses those releases in calculating and publishing WSJ Prime consensus rates.  This allows each Defendant to monitor the collusive

---

[16]    *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2013)).

agreement and ensure no other Defendant "cheats," despite the strong individual incentives for each bank to do so that are inherent in every cartel.

101.    Defendants' agreement is a horizontal conspiracy to fix, raise, and stabilize prime rates.  Such an agreement is *per se* unlawful under the antitrust laws.

102.    Though Defendants and their employees keep their unlawful conversations secret for obvious reasons, Plaintiffs' allegations of an agreement to fix, raise, and stabilize supracompetitive prime rates are supported by the available evidence.

### 1.    Parallel Pricing

103.    Because the conspiracy alleged herein predates the widespread adoption of the internet, publicly available information about individual bank rates is limited.  Complicating matters further is the fact that the Fed was unusually inactive in adjusting Fed Funds for much of the internet age, with Fed Funds remaining unchanged for nearly a decade between 2008 and 2016.  However, the Fed's decisions to move Fed Funds more regularly in the post-COVID timeframe, and Defendant Banks' immediate reactions to these decisions, demonstrate Defendants' coordination of their individual prime rates.  The two most recent changes in Fed Funds illustrate this pattern:

104.    <u>September 17, 2025</u>: At 2:00 p.m. ET, the Fed announced that it would lower Fed Funds from 4.5% to 4.25%.  At 3:03 p.m. ET, Defendant JPM posted on "X" (formerly Twitter) that it would decrease its prime rate 25 basis points to 7.25% (i.e., 4.25% + 300 bps).  At 4:17 p.m. ET, Defendant PNC lowered its prime rate 25 basis points to 7.25% in parallel.  That same day, Defendants Wells Fargo, Citi, U.S. Bank, and Truist all issued press releases moving their respective prime rates from 7.5% to 7.25%.[17]  BOA followed on September 18, 2025.

---

[17]    Not all Defendants' prime press releases are time-stamped.

105.    <u>December 18, 2024</u>: At 2:00 p.m. ET, the Fed announced that it would be lowering Fed Funds from 4.75% to 4.5%.  At 4:00 p.m. ET, Defendant JPM posted on "X" that it decreased its prime rate 25 basis points to 7.5% (i.e., 4.5% + 300 bps).  That same day, Defendants Wells Fargo, Citi, U.S. Bank, PNC, and Truist all issued press releases moving their respective prime rates from 7.75% to 7.5%.  BOA followed on December 19, 2024, also dropping its prime rate to 7.5%.

106.    In total, from January 2022 through September 2025, the Fed moved Fed Funds 15 times.  In all 15 cases, six of the seven Defendants changed their prime rates to exactly the new Fed Funds target + 300 bps in parallel on the same day, and Defendant Bank of America changed its prime rate to match the next day:

**FIGURE 2: Defendants' Parallel Changes to Their Individual Prime Rates on the Same Day as the Fed Changed Fed Funds[18]**

| Date of Fed and Defendants' Rate Change | Fed Funds Rate after Change | JPM Prime Rate | BOA Prime Rate | Wells Fargo Prime Rate | Citibank Prime Rate | U.S. Bank Prime Rate | PNC Bank Prime Rate | Truist Bank Prime Rate |
|---|---|---|---|---|---|---|---|---|
| December 14, 2016 | 0.75% | 3.75% | 3.75%* (+1) | 3.75% | 3.75% | 3.75% | 3.75% | 3.75%^ |
| March 15, 2017 | 1.00% | 4.00% | 4.00%* (+1) | 4.00% | 4.00% | 4.00% | 4.00% | 4.00%^ |
| June 14, 2017 | 1.25% | 4.25% | 4.25%* (+1) | 4.25% | 4.25% | 4.25% | 4.25% | 4.25%^ |
| December 13, 2017 | 1.50% | 4.50% | 4.50%* (+1) | 4.50% | 4.50% | 4.50% | 4.50% | 4.50%^ |
| March 21, 2018 | 1.75% | 4.75% | 4.75%* (+1) | 4.75% | 4.75% | 4.75% | 4.75% | 4.75%^ |
| June 13, 2018 | 2.00% | 5.00% | 5.00%* (+1) | 5.00% | 5.00% | 5.00% | 5.00% | 5.00%^ |
| September 26, 2018 | 2.25% | 5.25%* | 5.25%* (+1) | 5.25% | 5.25% | 5.25% | 5.25% | 5.25%^ |
| December 19, 2018 | 2.50% | 5.50% | 5.50%* (+1) | 5.50% | 5.50% | 5.50% | 5.50% | 5.50%^ |
| July 31, 2019 | 2.25% | 5.25% | 5.25%* (+1) | 5.25% | 5.25% | 5.25% | 5.25% | 5.25%^ |
| September 18, 2019 | 2.00% | 5.00% | 5.00%* (+1) | 5.00% | 5.00% | 5.00% | 5.00% | 5.00%^ |
| October 30, 2019 | 1.75% | 4.75% | 4.75%* (+1) | 4.75% | 4.75% | 4.75% | 4.75% | 4.75%^ |
| March 3, 2020 | 1.25% | 4.25% | 4.25%* (+1) | 4.25% | 4.25% | 4.25% | 4.25% | 4.25% |
| March 15, 2020 | 0.25% | 3.25% | 3.25%* (+1) | 3.25% (+1) | 3.25% (+1) | 3.25% (+1) | 3.25% (+1) | 3.25% (+1) |
| March 17, 2022 | 0.50% | 3.50% | 3.50%* | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% |
| May 4, 2022 | 1.00% | 4.00%* | 4.00%* (+1) | 4.00% (+1) | 4.00% | 4.00% | 4.00% | 4.00% (+1) |
| June 15, 2022 | 1.75% | 4.75% | 4.75%* (+1) | 4.75% | 4.75% | 4.75% | 4.75% | 4.75% |
| July 27, 2022 | 2.50% | 5.50% | 5.50%* (+1) | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% |
| September 21, 2022 | 3.25% | 6.25% | 6.25%* (+1) | 6.25% | 6.25% | 6.25% | 6.25% | 6.25% |
| November 2, 2022 | 4.00% | 7.00% | 7.00%* (+1) | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% |
| December 14, 2022 | 4.50% | 7.50% | 7.50%* (+1) | 7.50% | 7.50% | 7.50% | 7.50% | 7.50% |
| February 1, 2023 | 4.75% | 7.75% (+1) | 7.75%* (+1) | 7.75% | 7.75% | 7.75% | 7.75% | 7.75% |
| March 22, 2023 | 5.00% | 8.00%* (+1) | 8.00%* (+1) | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% |
| May 3, 2023 | 5.25% | 8.25% | 8.25%* (+1) | 8.25% | 8.25% | 8.25% | 8.25% | 8.25% |
| July 26, 2023 | 5.50% | 8.50% | 8.50%* (+1) | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% |
| September 18, 2024 | 5.00% | 8.00% | 8.00%* (+1) | 8.00% | 8.00% (+1) | 8.00% | 8.00% | 8.00% |
| November 7, 2024 | 4.75% | 7.75% | 7.75%* (+1) | 7.75% | 7.75% | 7.75% | 7.75% | 7.75% |
| December 18, 2024 | 4.50% | 7.50% | 7.50%* (+1) | 7.50% | 7.50% | 7.50% | 7.50% | 7.50% |
| September 17, 2025 | 4.25% | 7.25% | 7.25%* (+1) | 7.25% | 7.25% | 7.25% | 7.25% | 7.25% |

107.    As demonstrated above, over the past four years, Defendants have priced their prime rate loans, not merely in parallel but in near-perfect *unison*. On information and belief, this exact pattern of near unanimity stretches back nearly 30 years.

108.    Parallel conduct—"joint or concerted action," or "conscious parallelism"—is a traditional starting point for an antitrust claim.[19]  Because parallel conduct may not necessarily

---

[18]    For each prime rate identified in Figure 2, Plaintiffs have verified that the Defendant in question changed its prime rate on the date in question, with an accompanying announcement (e.g., via press release or tweet).  * indicates that historical data confirms the Defendant changed its prime rate on this date, but Plaintiffs have been unable to locate an accompanying announcement. (+1) indicates the change occurred one day after Fed Funds moved.  ^ indicates that a predecessor to the Defendant made the rate change.

[19]    *Gelboim*, 823 F.3d at 781 (quoting *Anderson News*, 680 F.3d at 183).

suggest an unlawful agreement but can be "in line with a wide swath of rational and competitive business strategy prompted by common perceptions of the market,"[20] courts require Plaintiffs to allege "plus factors" supporting an inference of conspiracy.

109. Though Plaintiffs allege "plus factors" below for completeness, this race has been running for so long that the results are in, and they are conclusive. Despite all the market-altering events described above, Defendants have set the same prime rate, which just so happens to be exactly a specific and round number of basis points above one of the most tracked rates in the world—Fed Funds—such that, on *7,889 of the last 7,971 days*, WSJ Prime has printed at exactly Fed Funds plus 300 bps. As noted above, Defendants each set their individual prime rates to Fed Funds plus 300 bps to achieve this outcome. It is, quite simply, *impossible* for Defendants to have exercised independent decision making in setting their prime rates in this manner.

### 2. Plus Factors Support a Strong Inference that Defendants Unlawfully Agreed—and Still Agree—to Fix, Raise, and Stabilize Prime Rates

110. Though the statistical data alone compels an inference of conspiracy, Plaintiffs also allege additional "plus factors" that further support the conclusion that Defendants coordinated their prime rate-pricing through an unlawful agreement.

111. *Defendants' history of manipulating reported benchmark interest rates.* In recent years, Defendants have been the subject of numerous government investigations and lawsuits due to their manipulation of reported benchmark interest rates. Defendants' established practice and pattern of manipulating benchmark interest rates strongly supports the plausibility of their conspiracy to fix and manipulate WSJ Prime.

---

[20] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).

112.     The following cases demonstrate Defendants' repeated pattern of coordinating to manipulate benchmark rates similar to WSJ Prime:

- **LIBOR Manipulation:** In 2011, in *In re LIBOR-Based Financial Instruments Antitrust Litigation*, individuals and entities that transacted in Eurodollar futures and options initiated lawsuits against several U.S. banks alleging that they conspired to manipulate LIBOR rates.  Following the 2008 financial crisis, the defendant banks "understated their borrowing costs to the British Bankers' Association to portray themselves as economically healthier than they were, thereby suppressing LIBOR. Like WSJ Prime, LIBOR was an interest rate used as a baseline for pricing various financial instruments.  Common Defendants in *LIBOR* include BOA, JPM, and Citi. Plaintiffs recovered nearly $1 billion from settling defendants."[21]

- **Euribor Manipulation:**  In 2013, in *Sullivan v. Barclays*, individuals and entities that transacted in Euribor-based derivatives initiated lawsuits against several U.S. banks alleging that they conspired to fix the European Interbank Offer Rate ("Euribor").  To facilitate their conspiracy, the defendant banks "routinely made false Euribor submissions that did not reflect actual borrowing costs in the inter-bank money market."[22]  Like WSJ Prime, Euribor is a benchmark interest rate used as a basis pricing financial instruments.[23]  Common Defendants included Citi and JPM. Plaintiffs recovered $651.5 million from settling bank defendants.[24]

- **Foreign Exchange Manipulation:**  In 2013, in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, individuals and entities involved in foreign currency transactions initiated lawsuits against several U.S. banks alleging a conspiracy to fix foreign currency prices and benchmark rates.  Bank defendants perpetrated this conspiracy by communicating directly with each other to coordinate their fixing of spot prices, manipulating FX benchmark rates, and exchanging confidential customer information.[25]  Like WSJ Prime, FX rates are benchmark rates used as a basis for

---

[21]     *LIBOR Bondholder Settlement*, BROADRIDGE (2012), www.broadridge.com/report/libor-bondholders-settlement (last visited Oct. 15, 2025) (https://perma.cc/SY2Y-2CYH).

[22]     Fourth Amended Class Action Complaint ¶112, *Sullivan v. Barclays PLC*, No. 13-cv-02811, ECF No. 174 (S.D.N.Y. Aug. 13, 2015).

[23]     *Id.* ¶107.

[24]     *Sullivan v. Barclays*, LOVELL STEWART HALEBIAN JACOBSON (Apr. 30, 2024), www.lshllp.com/news/post/sullivan-v-barclays-13-cv-02811-pkc-2,     (https://perma.cc/U96D-G22Z).

[25]     Fourth Consolidated Amended Class Action Complaint ¶6, *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-07789, ECF No. 2053 (S.D.N.Y. Mar. 27, 2023).

pricing financial instruments. Common Defendants included BOA, Citi, and JPM. Plaintiffs recovered $2.3 billion.[26]

- **ISDAfix Manipulation:** In 2014, in *Alaska Electrical Pension Fund v. Bank of Am. Corp.*, individuals and entities that participated in ISDAfix transactions initiated lawsuits against several U.S. banks alleging that they secretly colluded to fix and manipulate the ISDAfix rate. To maintain this conspiracy, defendant banks shared competitively sensitive pricing information with each other with the purpose and effect of rigging the ISDAfix reference rate.[27] Like WSJ Prime, ISDAfix is a benchmark rate used to determine pricing, for various financial instruments. Common Defendants included BOA, JPM, and Wells Fargo. Plaintiffs recovered over $500 million from settling bank defendants.[28]

113. *Defendants' history of anticompetitive collusion generally.* Beyond benchmark rate manipulation, Defendants have demonstrated a pattern of anticompetitive collusion across various financial markets. This broader pattern of collusion further supports the plausibility that they colluded to manipulate WSJ Prime.

- **ATM Fee Fixing:** In 2011, in *Mackmin v. Visa, Inc.*, ATM users initiated lawsuits against several U.S. banks for orchestrating a conspiracy to fix the ATM access fees.[29] The banks, through contractual restraints, prevented ATMs from offering discounts for withdrawals processed over competitors' networks.[30] Common Defendants include BOA, JPM, and Wells Fargo. Plaintiffs recovered $197.5 million in settlements.[31]

- **Credit Default Swaps:** In 2013, in *In re Credit Default Swaps Antitrust Litigation*, purchasers and sellers of credit default swaps initiated lawsuits against several U.S. banks alleging that they conspired to prevent price transparency and competition in

---

[26]    *Foreign Exchange Antitrust Litigation*, EPIQ (2024), www.fxantitrustsettlement.com (https://perma.cc/3S78-3KBR).

[27]    Second Consolidated Amended Class Action Complaint ¶5, *Alaska Electrical Pension Fund v. Bank of Am. Corp.*, No. 14-cv-07126, ECF No. 387 (S.D.N.Y. Feb. 7, 2017).

[28]    *ISDAfix Case Update*, FINANCIAL RECOVERY TECHNOLOGIES (June 27, 2018), frtservices.com/insights/isdafix-case-update-june-2018-settlements-for-the-remaining-five-defendants-have-been-preliminary-approved/ (https://perma.cc/4TZE-5B4V).

[29]    Second Amended Class Action Complaint ¶1, *Mackmin v. Visa, Inc.*, No. 11-cv-01831, ECF No. 84 (D.D.C. Nov. 11, 2015).

[30]    *Id.* ¶2.

[31]    *Visa Mastercard ATM*, HAGENS BERMAN (June 20, 2025), www.hbsslaw.com/cases/visa-mastercard-atm (https://perma.cc/69YE-LD2C).

the CDS market.[32]  During the 2008 financial crisis, defendants carried out their scheme through secret face-to-face meetings among senior personnel.[33]  Common Defendants included BOA, Citi, and JPM.  Plaintiffs recovered $1.84 billion in settlements.[34]

- **Interest Rate Swaps**:  In 2016, in *In re Interest Rate Swaps Antitrust Litigation*, individuals and entities that entered into interest rate swaps ("IRS") transactions initiated lawsuits against several U.S. banks alleging that they conspired to prevent investors from trading on transparent electronic platforms.[35]  To stifle competition, the banks agreed to jointly boycott platforms that facilitated greater competition.[36]  Common Defendants included BOA, Citi, and JPM.  In 2024, 11 bank defendants settled plaintiffs' claims for $46 million combined.[37]

- **Stock Lending Market**:  In 2017, in *Iowa Public Employees' Ret. Sys. v. Bank of Am. Corp.*, borrowers and lenders of stock initiated lawsuits against several U.S. banks alleging that they conspired to boycott electronic stock loan trading platforms to starve them of liquidity and maintain their stranglehold on the market.[38]  Common Defendants included BOA and JPM.  Plaintiffs recovered over $500 million from settling bank defendants.[39]

- **GSE Bonds**:  In 2019, in *In re GSE Bonds Antitrust Litigation*, purchasers and holders of government sponsored entity ("GSE") bonds initiated lawsuits against several banks alleging that they conspired to inflate the price of unsecured debt issued by Fannie Mae and Freddie Mac.  The slow and opaque structure of the GSE bond market

---

[32]    Second Consolidated Amended Class Action Complaint ¶1, *In re Credit Default Swaps Antitrust Litigation*, No. 13-md-02476, ECF No. 286 (S.D.N.Y. Apr. 14, 2014).

[33]    *Id.*

[34]    *Credit Default Swaps Antitrust Litigation*, PEARSON WARSHAW, pwfirm.com/credit-default-swaps-antitrust-litigation/ (last visited Oct. 15, 2025) (https://perma.cc/D2K9-BRXM).

[35]    Fourth Consolidated Amended Class Action Complaint ¶4, *In re Interest Rate Swaps Antitrust Litigation*, No. 16-md-2704, ECF No. 748 (S.D.N.Y. Mar. 22, 2019).

[36]    *Id.* ¶18.

[37]    Sabrina Willmer, *Big Banks to Pay $46 Million to Settle Swaps Collusion Case*, CLAIMS JOURNAL (June 28, 2024), www.claimsjournal.com/news/national/2024/06/28/324775.htm (https://perma.cc/PR4Z-FW9K).

[38]    Amended Class Action Complaint ¶¶9-10, *Iowa Public Employees' Ret. Sys. v. Bank of Am. Corp.*, No. 17-cv-06221, ECF No. 73 (S.D.N.Y. Nov. 17, 2017).

[39]    Bloomberg, *Four major banks settle stock-lending suit*, INVESTMENTNEWS (Aug. 23, 2023), www.investmentnews.com/retirement-planning/four-major-banks-settle-stock-lending-suit/241391 (https://perma.cc/2CKP-WQKP).

facilitated bank defendants' conspiracy to unlawfully increase their own profits.[40] Common Defendants included BOA, Citi, and JPM.  Plaintiffs have recovered $386.5 million from settling banks.[41]

- **European Government Bonds:**  In 2019, in *In re European Government Bonds Antitrust Litigation*, purchasers and holders of European Government Bonds initiated lawsuits against several banks alleging an anticompetitive scheme to fix, raise, maintain and stabilize the price of Euro-denominated bonds.[42]  To carry out their scheme, the bank defendants collusively bid above market price auction, guaranteeing themselves a dominant share of supply (and control over prices).[43]  Common Defendants included BOA, Citi, and JPM.  In December 2024, plaintiffs' settlement award of $120 million was approved by the court.[44]

114.    Collectively, these cases demonstrate that Defendants have repeatedly engaged in coordinated manipulation of benchmark rates and collusive conduct across financial markets.  The settlements and judgments in these cases total over $7 billion.  This extensive history of collusion strongly supports the inference that Defendants similarly coordinated to fix WSJ Prime—another benchmark rate that serves as the foundation for pricing trillions of dollars in loans.

115.    *A high level of interfirm communications.*  The banking industry is close-knit, and the bank employees responsible for setting prime rate policy knew each other well when the conspiracy began and continue to maintain strong inter-firm relationships to the present day.  Trade groups regularly provide venues in which executives can speak to one another off the record.  On information and belief, rate-setting executives also maintain social relationships with each other

---

[40]    Third Consolidated Amended Class Action Complaint ¶5, *In re GSE Bonds Antitrust Litigation*, No. 19-cv-01704, ECF No. 254 (S.D.N.Y. Sept. 10, 2019).

[41]    *GSE Bonds Antitrust Litigation*, gsebondantitrustsettlement.com (last visited Oct. 15, 2025) (https://perma.cc/GES8-TDDQ).

[42]    Fifth Amended Consolidated Class Action Complaint ¶1, *In re European Government Bonds Antitrust Litigation*, No. 19-cv-02601, ECF No. 410 (S.D.N.Y. Oct. 16, 2023).

[43]    *Id.* ¶7.

[44]    *Scott+Scott Secures $120M Recovery in Case Against* Banks, SCOTT+SCOTT (Jan. 15, 2025)    scott-scott.com/scottscott-secures-120m-recovery-in-case-against-global-banks/ (https://perma.cc/8FXW-DK43).

across firms, either through business or through the networks that characterize the finance industry: schools, former colleagues, social clubs, and institutions.

116.    Historically, bank employees involved in rate-setting have been discovered using Bloomberg chats, emails, phone calls and in-person meetings to fix and manipulate rates.  In the LIBOR manipulation cases, defendant banks communicated through Bloomberg chats to coordinate their rate submissions.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-cv-02613 (S.D.N.Y. 2011).  Similarly, in the Foreign Exchange manipulation cases, bank defendants communicated "directly with each other" through electronic messaging to coordinate their fixing of spot prices.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-07789 (S.D.N.Y. 2013).  In Euribor manipulation cases, defendant banks routinely exchanged messages to coordinate their rate submissions.  *See Sullivan v. Barclays PLC*, No. 13-cv-02811 (S.D.N.Y. 2013).  And in GSE bonds manipulation cases, banks communicated to coordinate bidding strategies at auctions.  *See In re GSE Bonds Antitrust Litig.*, No. 19-cv-01704 (S.D.N.Y. 2019).  These cases demonstrate that when banks coordinate on benchmark rates, they do so through direct communications.

117.    Though bank compliance officials have monitored interfirm communications via Bloomberg chats and other recorded channels more closely in recent years, bank employees have, especially since 2020, been repeatedly caught using personal cell phones for work communications.  Meanwhile, private encrypted chat apps outside compliance officials' control have proliferated.

118.    Banks also communicate with each other in broad daylight through the press.  All seven named Defendants make their current prime rates public using press releases or by posting them on public-facing websites, ensuring that all Defendants know their competitors' current

42

prices in real time.  All Defendants also know and expect that their published prime rates will be reported by the Journal as WSJ Prime, and have explicitly incorporated WSJ Prime into their loan instruments in reflection of this expectation.

119.    Defendants have publicly acknowledged that they price prime rates by adding 300 bps to Fed Funds.  For example, Citi states that the prime rate "can vary by institution"—though it does not, at least as to Defendant banks—"but it's roughly"—meaning always and exactly—"the federal funds rate, plus 3 percentage points."[45]  JPM similarly states, "Lenders will look at the federal funds rate (set by the Fed) and typically"—meaning always—"add another 3% on top of that."[46]

120.    In fact, the practical effect of Defendants' conspiracy is common knowledge in the finance industry worldwide.  What follows is a sampling of industry participants' and others' descriptions of how Defendants fix prime rates to Fed Funds + 300 bps:

- "There is a rule of thumb that the prime rate is fed funds plus 3 . . . . The prime rate moves only when the federal funds rate moves . . . ."[47]

- "The prime rate used to be defined as the interest rate at which banks lend to their most creditworthy (prime) customers.  Now, it is simply an index that is 3 percentage points above the federal funds rate set by the Federal Reserve."[48]

- "When the Federal Reserve started specifying a range for the federal funds rate, the prime rate became set to be 300 points above the upper range of the Fed's range."[49]

---

[45]    *What Is the Prime Rate?*, CITI, *supra* note 9.

[46]    *What Is a Prime Rate?*, CHASE, *supra* note 9.

[47]    David Rodeck, *What is the Prime Rate?*, FORBES ADVISOR (updated: Feb. 15, 2022 at 12:56 pm), https://www.nasdaq.com/articles/what-is-the-prime-rate (https://perma.cc/JR93-DAKQ).

[48]    *Credit Card Glossary: Prime rate (or prime interest rate)*, CREDITCARDS.COM, www.creditcards.com/credit-card-news/glossary/term-prime-rate-or-prime-interest-rate (last visited Oct. 15, 2025) (https://perma.cc/JG24-WDHH).

[49]    Steve Lander, *Relationship Between Changes in the Federal Funds Rate and the Prime Rate*, SFGate (Sept. 15, 2013), https://homeguides.sfgate.com/relationship-between-changes-federal-funds-rate-prime-rate-87011.html.

- "Although not directly controlled by the Fed, Prime always moves in lockstep with the Fed Funds ceiling set by the FOMC. Prime is reactive, meaning it only changes after the Fed hikes or cuts . . . . The general rule of thumb for determining Prime is Fed Funds + 3.00%."[50]

- "The Prime Rate is usually adjusted at the same time and in correlation to the adjustments of the Fed Funds Rate, which is set by a special rate setting committee of the Federal Reserve called the FOMC. In recent history, the Prime Interest Rate has been set at 3% over the high end of the range for Fed Funds."[51]

- "In the US, the WSJ's Prime rate index has stayed exactly 300 basis points above the Federal Reserve's Fed Funds Rate for the past two decades."[52]

121.    Though few seem to understand the conspiracy's unlawful dimension, Defendants' price-fixing is so commonly discussed in the industry that it would be remarkable if Defendants did not discuss it among themselves.

122.    *Common motive to conspire*.  Defendants had strong motives to strike and maintain their conspiracy.  As demonstrated by the data above, before the conspiracy, Defendants operated in a highly competitive market that forced them to offer prime rates *very* close to the rates at which they themselves borrowed money.  By colluding, they fixed, raised, and stabilized prime rate spreads at a level far above the average that had prevailed before the conspiracy.  Not only did this raise rates on *prime* loans, but also on the trillions of dollars of consumer and small business loans indexed to WSJ Prime.   By maintaining their collusive conspiracy, Defendants have reaped supracompetitive interest rates from these loans since 1992.

123.    *Acts against individual self-interest.*  In a competitive market, banks must maintain rates at low, competitive levels or lose customers.  In the absence of Defendants' conspiracy,

---

[50]    *Hedging Prime*, PENSFORD, www.pensford.com/resources/prime-vs-libor/ (last visited Oct. 15, 2025) (https://perma.cc/C87V-N5TP).

[51]    *What is the Prime Rate?*, MONEYCAFE, www.moneycafe.com/prime-rate/ (last visited Oct. 15, 2025) (https://perma.cc/7JZA-JZHZ).

[52]    *Canada Prime Rate History*, WOWA (Updated Nov. 12, 2024), wowa.ca/banks/prime-rates-canada (https://perma.cc/32L9-EVK4).

Defendants who could profitably offer lower prime rates would do so and would thereby gain customers and loan volume.  The data from the pre-conspiracy period demonstrates this—in the competitive market that predated the conspiracy, rates changed frequently and banks typically offered a range of rates consistent with their individual circumstances.  In a competitive market, charging supracompetitive prices is untenable because customers migrate to banks offering better rates.  Major banks can charge supracompetitive rates only when they collude to maintain those rates.

124.    *High market concentration*.  The top 10 banks collectively hold nearly 50% of American bank deposits.  The top five banks alone hold 38% of deposits.  On information and belief, Defendants' market share of prime borrowers—the most creditworthy customers with access to the lowest rates—is significantly higher than their overall deposit market share.

125.    The remainder of the industry is highly diffuse, with non-Defendant banks holding no more market share than 2.75% each, and the largest bank outside the top 10 holding just 1.26% of deposits.  Most non-Defendant depository institutions are much smaller regional banks that cannot achieve the economies of scale required to compete effectively with major national banks.  Even if a smaller bank was to offer rates to prime customers below WSJ Prime, those rates would not be counted in the WSJ Prime Rate unless the competitor bank gained sufficient market share to break into the top ten banks—as of the date of this writing, to break into the top 10 banks and thereby even have an *opportunity* to influence WSJ Prime, a bank must reach *$300 Billion* in deposits.  Because banks' lending capacity is constrained in part by their deposits, gaining this level of market share would require years of organic growth or, more realistically, a series of major acquisitions subject to extensive regulatory approval.  This high barrier to entry effectively insulates Defendants from competitive pressure.  Defendants thus possess sufficient market power

45

to maintain supracompetitive prices without meaningful fear of new competition eroding their market shares or undermining their coordinated pricing scheme.

## V.    HARM TO COMPETITION AND ANTITRUST INJURY

### A.    Home Equity Lines of Credit

126.    A HELOC is a debt instrument by which a bank lends a consumer money, secured by an interest in real property owned by the consumer.

127.    HELOCs are often, but not always, subordinate to primary mortgages, and are often, but not always, used by consumers to make improvements to the secured real property.

128.    Disputes relating to HELOCs that are secured by the principal residence of the debtor, like those Defendants offered to Plaintiff Normandin and members of the HELOC Class, are immune from arbitration by statute.  *See* 15 U.S.C. §1639c(e).

129.    Most HELOC contracts charge variable or floating interest rates.  While the APRs of HELOCs and similar loans were traditionally tied to the issuing bank's prime rate, today nearly all HELOCs are indexed to a single, central rate: WSJ Prime.  The rate charged to the customer in these HELOCs is expressed as WSJ Prime plus a spread.

### B.    Consumer Credit Cards

130.    "Consumer Credit Cards" are revolving lines of credit, issued by banks to individual consumers (as opposed to businesses).

131.    Often, but not always, Consumer Credit Cards are unsecured loans.

132.    Almost all Consumer Credit Card contracts are variable-rate loans.  While the APRs of Consumer Credit Cards and similar loans were traditionally tied to the issuing bank's prime rate, today nearly all Consumer Credit Cards are indexed to a single, central rate: WSJ Prime.  The rate charged to the customer in these Consumer Credit Cards is expressed as WSJ Prime plus a spread.

133.    Disputes relating to Consumer Credit Cards issued to members of the United States military, or their dependents, are immune from arbitration by statute.  *See* 10 U.S.C. §987(e)(3).

### C.    As a Result of Defendants' Collusive Agreement, Plaintiffs Paid Defendants More than They Would Have Absent Defendants' Agreement

134.    As described above, Defendants unlawfully fixed their prime rates—and, as a result, WSJ Prime—at the supracompetitive level of Fed Funds plus 300 bps.

135.    This raised prices not only for bank customers who pay prime rates but also for customers, like Plaintiffs, with WSJ Prime-Indexed Loans, including HELOCs and variable-rate credit cards.  Because Defendants knowingly and deliberately fixed their respective prime rates and WSJ Prime, their price-fixing agreement resulted in higher prices for Plaintiffs and the Classes.

136.    But for Defendants' unlawful agreement, WSJ Prime would be set by rational economic actors acting in their individual best interests and would be significantly lower than Fed Funds plus 300 bps, just as it was before Defendants' agreement.

137.    This is true even for Class members who obtained WSJ Prime-Indexed Loans from non-defendant banks.  Because Defendants control the majority of deposits in the United States and collectively determine WSJ Prime through their coordinated rate-setting, they fixed the benchmark rate to which all WSJ Prime-Indexed Loans are tied.  Non-defendant banks offering WSJ Prime-Indexed Loans have no practical alternative but to index their loans to the WSJ Prime Rate that Defendants collusively established.  Thus, Defendants' conspiracy directly raised prices even for customers whose loans were issued by non-defendant banks.  This is a classic "price umbrella" effect: the conspiring defendants' supracompetitive price creates an umbrella under which even non-conspirators can charge elevated prices, and customers throughout the market— including those who never transacted directly with defendants—pay artificially inflated rates.

138.    Indeed, Defendants' unlawful overcharges represented a substantial portion of the interest Plaintiffs and the Classes paid on their WSJ Prime-Indexed Loans.  For example, during part of the Class Period (from 2021 to March 2022), FFTR was set by the Fed at the historic low of 0.25%, while WSJ Prime stood at 3.25%.  Were it not for Defendants' collusive agreement, WSJ Prime would likely have been closer to the FFTR plus 180 bps average that prevailed during the pre-conspiracy period—approximately 2.05%.

139.    HELOC customers especially often secure loans at rates very close to WSJ Prime. As of this writing, the average HELOC rate, according to Bankrate.com, is only 59 bps above WSJ Prime.  Thus, if a HELOC customer in 2021 borrowed from a Defendant at WSJ Prime plus 59 bps, the customer's rate in the actual world would have been 3.84% (3.25% + 0.59%), but absent Defendants' conspiracy, it would have been approximately 2.64% (2.05% + 0.59%).  This hypothetical customer paid approximately 45% more in interest during this period than they would have absent Defendants' conspiracy.

140.    As a result of Defendants' conduct described herein, Plaintiffs and members of the Classes have paid artificially inflated interest rates on their WSJ Prime-Indexed Loans.

## VI.    CONTINUING VIOLATIONS

141.    Defendants' unlawful conspiracy is ongoing.  Defendants constantly reaffirm their agreement through coordinated conduct: they ignore material business conditions that would incentivize independent rate adjustments, they move their rates in lockstep whenever the Fed adjusts Fed Funds, and they demand supracompetitive prices from millions of borrowers every billing cycle.

142.    Every time the Fed changes the Fed Funds Target Rate, each Defendant changes its prime rate in unison with the others, pursuant to their unlawful agreement, knowing that every other Defendant will do the same.

143.    Every time Defendants bill a payment on a WSJ Prime-Indexed HELOC or Consumer Credit Card, they demand supracompetitive, artificially inflated prices from their customers, including Plaintiffs and Class members pay these bills, they suffer damages from Defendants' conspiracy.  These repeated acts of price-fixing constitute continuing violations that accrue new damages with each transaction.

## VII.    CLASS ACTION ALLEGATIONS

144.    Plaintiffs bring this action on behalf of three classes.

145.    Plaintiff Normandin brings this action on behalf of himself and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class ("HELOC Class"):

> All persons, whether individuals or non-governmental entities, who made a payment on a WSJ Prime-Indexed HELOC during any time from October 16, 2021, to the date Defendants' anticompetitive conduct stops.

146.    Plaintiff Sensabaugh brings this action on his own behalf and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class ("Consumer CC Class"):

> All individual persons who made a payment on a WSJ Prime-Indexed Consumer Credit Card during any time from October 16, 2021, to the date Defendants' anticompetitive conduct stops.

147.    Plaintiff Sensabaugh brings this action on his own behalf and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class ("Military CC Class"):

> All military members,[53] their spouses, and their dependent children aged 21 and under, who made a payment on a WSJ Prime-Indexed Consumer Credit Card during any time from October 16, 2021, to the date Defendants' anticompetitive conduct stops.

---

[53]    *See* 10 U.S.C. §987(i)(1).

148.    Excluded from the Classes are Defendants and their officers and directors, as well as any employee of any Defendant who participated in setting prime rates in any way.  Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

149.    **Class Period**: The Class Period is presently defined as October 16, 2021, through the present.  Plaintiffs reserve all rights to amend this Complaint as appropriate.

150.    **Class Identity**: The Classes are readily identifiable and are ones for which records exist.

151.    **Numerosity**: Plaintiffs do not know the precise number of members of the Classes because such information presently is in the control of Defendants and other market participants. Plaintiffs believe that due to the nature of the trade and commerce involved, there are at least hundreds of thousands of Class members in each Class, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

152.    **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Classes because Plaintiffs entered into WSJ Prime-Indexed Loans and paid artificially inflated interest rates on those as a result of Defendants' conduct.  Therefore, Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Classes and the relief sought is common to the Classes.

153.    **Common Questions Predominate**: There are questions of law and fact common to the Classes, including, but not limited to:

A.    whether Defendants agreed to fix, raise, and stabilize their prime rates and WSJ Prime;

B.    the identity of the participants in the alleged agreement;

C.      whether Defendants' agreement violated Section 1 of the Sherman Act, 15 U.S.C. §1;

D.      whether Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and members of the Classes;

E.      the effect of Defendants' agreement on the interest rates Plaintiffs and members of the Classes paid pursuant to their WSJ Prime-Indexed Loans during the Class Period; and

F.      the appropriate class-wide measure of damages, including whether Plaintiffs and members of the Classes are entitled to: (1) monetary relief, including treble damages; (2) interest from the date they should have received all monies rightfully owed; (3) attorneys' fees and costs; and (4) any other relief the Court deems just and reasonable.

These and other questions of law or fact which are common to the members of the Classes predominate over any questions affecting only individual members of the Classes.

154.    **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Classes. Each Plaintiff's interests are aligned with, and not antagonistic to, other members of the respective Classes who paid inflated interest rates on WSJ Prime-Indexed Loans. Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Classes. Plaintiffs and their counsel are committed to vigorously prosecuting this action and have the resources to do so.

155.    **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual joinder of all damaged Class members is impracticable given the geographic dispersion of the Classes and the number of Class members. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class members compared to the expense and burden of individual prosecution means that, absent a class action, it would not be economically feasible for Class members to seek redress for the violations of law alleged herein. Furthermore, individual litigation would present the potential for inconsistent or contradictory judgments and would greatly

magnify delay and expense to all parties and to the court system.  Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

156.    The Classes are readily definable, and records establishing class membership likely exist in the files of Plaintiffs, members of the Classes, Defendants, and other market participants.

## VIII.   CLAIMS FOR RELIEF

**COUNT I:**
**PRICE-FIXING IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §1**
**(on behalf of the HELOC Class)**

157.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

158.    From at least October 16, 2021, and continuing to the present, Defendants participated in an agreement to set and fix their respective prime rates, and as a result, WSJ Prime, at an artificial level.  Defendants, horizontal competitors in the markets for consumer and small business loans, including those indexed to WSJ Prime, such as WSJ Prime-Indexed HELOCs, agreed with each other to fix, raise, and stabilize the interest rates they would charge prime customers, and knowing the prime rates would be used by The Journal for calculating and publishing the WSJ Prime Rate.

159.    In connection with issuing, offering, and selling debt instruments with interest rates indexed to WSJ Prime, including WSJ Prime-Indexed HELOCs, Defendants directly profited from their unlawful agreement.

160.    Defendants' conduct is a *per se* violation of federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

161.    As a proximate result of Defendants' unlawful conduct, Plaintiff Normandin and members of the HELOC Class have suffered and continue to suffer injury to their business or property.   These injuries include, but are not limited to, paying artificially high and non-competitive interest rates on their WSJ Prime-Indexed HELOCs.   Plaintiff Normandin and members of the HELOC Class are each entitled to treble damages for Defendants' violations of the Sherman Act alleged herein.

### COUNT II:
### PRICE-FIXING IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §1
### (on behalf of the Consumer CC Class)

162.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

163.    From at least October 16, 2021, and continuing to the present, Defendants participated in an agreement to set and fix their respective prime rates, and as as a result, WSJ Prime, at an artificial level.   Defendants, horizontal competitors in the markets for consumer and small business loans, including those indexed to WSJ Prime, such as WSJ Prime-Indexed Consumer Credit Cards, agreed with each other to fix, raise, and stabilize the interest rates they would charge prime customers, and knowing the prime rates would be used by The Journal for calculating and publishing the WSJ Prime Rate.

164.    In connection with issuing, offering, and selling debt instruments with interest rates indexed to WSJ Prime, including WSJ Prime-Indexed Consumer Credit Cards, Defendants directly profited from their unlawful agreement.

165.    Defendants' conduct is a *per se* violation of federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

166.　　As a proximate result of Defendants' unlawful conduct, Plaintiff Sensabaugh and members of the Consumer CC Class have suffered and continue to suffer injury to their business or property.　These injuries include, but are not limited to, paying artificially high and non-competitive interest rates on their WSJ Prime-Indexed Consumer Credit Cards.　Plaintiff Sensabaugh and members of the Consumer CC Class are each entitled to treble damages for Defendants' violations of the Sherman Act alleged herein.

## COUNT III:
## PRICE-FIXING IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §1
### (on behalf of the Military CC Class)

167.　　Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

168.　　From at least October 16, 2021, and continuing to the present, Defendants participated in an agreement to set and fix their respective prime rates, and as as a result, WSJ Prime, at an artificial level.　Defendants, horizontal competitors in the markets for consumer and small business loans, including those indexed to WSJ Prime, such as WSJ Prime-Indexed Consumer Credit Cards, agreed with each other to fix, raise, and stabilize the interest rates they would charge prime customers, and knowing the prime rates would be used by The Journal for calculating and publishing the WSJ Prime Rate.

169.　　In connection with issuing, offering, and selling debt instruments with interest rates indexed to WSJ Prime, including WSJ Prime-Indexed Consumer Credit Cards, Defendants directly profited from their unlawful agreement.

170.　　Defendants' conduct is a *per se* violation of federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

171.    As a proximate result of Defendants' unlawful conduct, Plaintiff Sensabaugh and members of the Military CC Class have suffered and continue to suffer injury to their business or property.   These injuries include, but are not limited to, paying artificially high and non-competitive interest rates on their WSJ Prime-Indexed Consumer Credit Cards.   Plaintiff Sensabaugh and members of the Military CC Class are each entitled to treble damages for Defendants' violations of the Sherman Act alleged herein.

## IX.    PRAYER FOR RELIEF

Plaintiffs respectfully pray that This Honorable Court:

A.    Certifies this lawsuit as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), that Plaintiffs be designated as Class Representatives of their respective three Classes, that Plaintiffs' counsel be appointed as counsel for all Classes, and that the Court directs that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to each and every member of the Classes;

B.    Adjudge that Defendants violated each of the federal laws set forth above;

C.    Award Plaintiffs damages, subject to trebling, including actual, rescissory, punitive, and exemplary damages;

D.    Award reasonable attorneys' fees, costs of suit, including costs of consulting and testifying experts, and pre- and post-judgment interest;

E.    Establish a constructive trust into which Defendants shall disgorge all ill-gotten gains from which Plaintiffs may obtain restitution; and

F.    Grant such other, further, and different relief as may be just and proper.

## X.    DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a Trial by Jury as to all issues so triable.

Dated: October 16, 2025

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Peter Cherepanov
Peter Cherepanov (CT Bar #31808)
Patrick McGahan (*pro hac vice forthcoming*)
Michael Srodoski (*pro hac vice forthcoming*)
Erin Dennehy (CT Bar #31992)
156 S Main Street
P.O. Box 192
Colchester, CT 06415
Tel: (860) 537-5537
pcherepanov@scott-scott.com
pmcgahan@scott-scott.com
msrodoski@scott-scott.com
edennehy@scott-scott.com

Carmen Medici (*pro hac vice forthcoming*)
Patrick Rodriguez (*pro hac vice forthcoming*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
cmedici@scott-scott.com
prodriguez@scott-scott.com

Karin E. Garvey (*pro hac vice forthcoming*)
Matthew Perez (*pro hac vice forthcoming*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Ave., 24th Floor
New York, NY 11069
Tel: (212) 223-6444 600
kgarvey@scott-scott.com
mperez@scott-scott.com

*Counsel for Plaintiffs*